UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

JAMES PAUL ROGERS,

        Plaintiff,

    v.

WESTERN GOVERNORS UNIVERSITY,

        Defendant.

Case No. 23-cv-3774-JPG

**<u>MEMORANDUM AND ORDER</u>**

    This matter comes before Court on the motion for summary judgment filed by defendant Western Governors University ("WGU") on the remaining claims in this case (Doc. 53). Plaintiff James Paul Rogers has responded to the motion (Doc. 61), and WGU has replied to that response (Doc. 63).[1]  Because Rogers has failed to point to evidence from which a reasonable factfinder could find for him on any of his claims, the Court will grant summary judgment to WGU.

**I.    Standard for Summary Judgment**

    Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Spath v. Hayes Wheels Int'l-Ind., Inc.*, 211 F.3d 392, 396 (7th Cir. 2000).  The Court must construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of that

---

[1] Rogers has also filed a sur-reply brief in answer to WGU's reply (Doc. 68).  In light of the Court's order striking the brief (Doc. 73), the Court disregards it for the purposes of the pending summary judgment motion.  But as it has assured Rogers, any argument WGU raises for the first time in its reply brief is generally waived.  *Wright v. United States*, 139 F.3d 551, 553 (7th Cir. 1998).

party.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Chelios v. Heavener*, 520 F.3d 678, 685 (7th Cir. 2008); *Spath*, 211 F.3d at 396.  Nevertheless, the "favor toward the nonmoving party does not extend to drawing inferences that are supported by only speculation or conjecture." *Monroe v. Ind. Dep't of Transp.*, 871 F.3d 495, 503 (7th Cir. 2017) (internal quotations and citations omitted).  "[I]nferences that are supported by only speculation or conjecture will not defeat a summary judgment motion." *Weaver v. Speedway, LLC*, 28 F.4th 816, 820 (7th Cir. 2022) (internal quotations omitted).

The initial summary judgment burden of production is on the moving party to show the Court that there is no reason to have a trial.  *Celotex*, 477 U.S. at 323; *Modrowski v. Pigatto*, 712 F.3d 1166, 1168 (7th Cir. 2013).  Where the nonmoving party carries the burden of proof at trial, the moving party may satisfy its burden of production in one of two ways.  It may present evidence that affirmatively negates an essential element of the nonmoving party's case, *see* Fed. R. Civ. P. 56(c)(1)(A), or it may point to an absence of evidence to support an essential element of the nonmoving party's case without actually submitting any evidence, *see* Fed. R. Civ. P. 56(c)(1)(B).  *Celotex*, 477 U.S. at 322-25; *Modrowski*, 712 F.3d at 1169.  Where the moving party fails to meet its strict burden, a court cannot enter summary judgment for the moving party even if the opposing party fails to present relevant evidence in response to the motion.  *Cooper v. Lane*, 969 F.2d 368, 371 (7th Cir. 1992).

In responding to a summary judgment motion, the nonmoving party may not simply rest upon the allegations contained in the pleadings but must present specific facts to show that a genuine issue of material fact exists.  *Celotex*, 477 U.S. at 322-26; *Anderson*, 477 U.S. at 256-57; *Modrowski*, 712 F.3d at 1168.  A genuine issue of material fact is not demonstrated by the mere existence of "some alleged factual dispute between the parties," *Anderson*, 477 U.S. at 247, or by

"some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Rather, a genuine issue of material fact exists only if "a fair-minded jury could return a verdict for the [nonmoving party] on the evidence presented." *Anderson,* 477 U.S. at 252.

## II.    Facts

### A.    Evidence Considered

As a preliminary matter, in ruling on a motion for summary judgment, the Court considers only evidence that would be admissible at trial, although it need not be presented at the summary judgment stage in a form that would be admissible at trial.  *Cairel v. Alderden*, 821 F.3d 823, 830 (7th Cir. 2016); *Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009).

Rogers's response to WGU's summary judgment motion, weighing in at 226 pages, far exceeds the 20-page limit set forth in SDIL-LR 7.1.  It is hard to tell how many of those pages actually count toward the 20-page limit because Rogers has pasted his exhibits—without proper authentication—between his unsworn explanations of what the exhibits are, and has expounded on his disputes of WGU's statements of material fact far beyond each statement itself.  Nevertheless, the Court has read all of the legible parts to assist in understanding the context of this case.

To be used at the summary judgment stage, testimony must be sworn, for example, in an affidavit or deposition, or declared as true under penalty of perjury pursuant to 28 U.S.C. § 1746.  If it is not, the Court must disregard it.  *See Pfeil v. Rogers*, 757 F.2d 850, 859 (7th Cir. 1985).  Likewise, documents and exhibits must be properly authenticated.  *Smith v. City of Chi.*, 242 F.3d 737, 741 (7th Cir. 2001).  Additionally, as a given, the exhibit should be legible, which some of Rogers's exhibits are not.  To the extent Rogers's unsworn statements purport to explain

snippets of his exhibits, the Court will disregard them and the exhibits they support, unless WGU has accepted the authenticity of the exhibit.

Additionally, to contest the facts alleged in WGU's Statement of Material Facts ("SOMF"), a party must cite in the record to the conflicting evidence upon which it relies to show the fact is disputed. SDIL-LR 56.1(b). To the extent Rogers has not cited evidence in support of a dispute of facts in WGU's SOMF and has instead provided an unsworn narrative explanation, the Court has disregarded that dispute and deems the fact admitted for the purposes of summary judgment, *see* SDIL-LR 56.1(g).

WGU also complains of Rogers's self-serving affidavit that contradicts statements in his deposition. The Court has not been able to locate an affidavit in the materials Rogers has submitted, and it has disregarded his unsworn statements. Therefore, this argument is moot.

With the foregoing in mind, the Court turns to the facts established by the evidence.

B.     Relevant Facts

Viewing all the relevant evidence and drawing all reasonable inferences therefrom in favor of Rogers, the Court finds the following facts for the purposes of this motion.

1.     The Parties

Rogers is a White veteran of the United States Armed Forces. He suffered from tinnitus, a service-connected disability, which caused ringing in his ears, loss of concentration, and difficulty hearing. This was reflected in Veterans Affairs ("VA") documents to which WGU had access. He also had a host of other medical conditions that caused a range of problems.

WGU is a private, non-profit university offering online classes to students seeking bachelor's and master's degrees. One of its programs is the Accelerated Information Technology Program that allows students to work toward two degrees, a Bachelor of Science in Information

Technology and a Master of Science in Information Technology.  They must, however, complete the bachelor's degree before starting on the master's degree.

Under WGU's Accelerated Courses Policy, students could add an additional course to a term as they completed the course in which they were originally enrolled for the term so long as they could complete the additional, "accelerated" course by the end of the semester.  However, they were not permitted to take all the courses in a program at the same time.  Usually, students would take one course at a time and, when they completed that course, would enroll in another. The transition was not instantaneous; often there was a delay between finishing one course and having another course available.  Students could complete as many courses as they could in a semester by taking them sequentially.

WGU also had a policy for Accommodations for Students with Disabilities ("Accommodations Policy").  Under that policy, if a student with a disability wanted an accommodation, they needed to contact WGU's Student Disability Services office to initiate the accommodation request and to complete the request process.  That process included submitting sufficient documentation to support the existence of a disability, completing the Accommodation Request Form, and participating in the interactive process of identifying appropriate accommodations.  The Accommodations Policy describes the interactive process as an "interactive conversation between the student and Student Disability Services to discuss diagnosis, academic limitations, and possible accommodations."  Accommodations Policy ¶ III.2.  The policy was clear that no other department at WGU could provide accommodations without going through the interactive process with Student Disability Services.

       2.    <u>Rogers Begins Studies at WGU</u>

Rogers decided to enroll at WGU's Accelerated Information Technology Program due in

great part to its promotional materials, which touted that he could "go at his own pace" to complete courses as fast as he could, that WGU would be "flexible" in its programming, and that WGU supported veterans. Rogers thought this meant he could take six to eight courses at a time—his preferred pace—to meet his goal of obtaining his bachelor's degree in one semester or less, and then immediately begin to work on his master's degree, earning both degrees in twelve to eighteen months.

In late February 2023, after VA funding had been dedicated for Rogers to attend WGU, Rogers asked to take six to eight courses at a time, but WGU only allowed him to take four at a time. Rogers considered this to be contrary to its marketing material saying that he could "go at his own pace" and that WGU's programs were "flexible." It was, however, consistent with WGU's handbook.

On March 1, 2023, Rogers began taking courses in the Accelerated Information Technology Program. When he completed one of his four courses, WGU would allow him to begin another, although often with the aforementioned delay between access to courses. He completed a substantial number of courses before May 2023.

> 3.     Rogers's Health Crisis

On May 3, 2023, he had a severe heart attack, which required him to stay in the hospital for several days. After he was released from the hospital, he had a medicine regime and exertional restrictions. His physical and mental health conditions were unsettled after the heart attack, and he became extremely anxious about his continued studies at WGU, including his ability to successfully complete the semester on time and both of his degrees in his hoped-for time period. In the aftermath of his heart attack, he was frantic and desperate about his studies.

Currently, Rogers describes himself as "pretty much okay," but his heart condition will

never go away and he will always need to tend to it.

4.      Rogers's Requests Accommodations

Immediately after his heart attack, Rogers was not able to study certain courses as a result of the effects of his heart attack.  He asked his mentor to allow him to set aside his active courses to work on other classes that involved more reading, which he found to be low stress academic work.  His mentor tried to accommodate Rogers's request but was not able to because of the limits on the number of courses that could be available to a student at one time.

Again, Rogers asked his mentor for access to six to eight courses or "just a few more,"— or at least the syllabi and reading lists for those courses—so he could start reading the required books to be better prepared to take the courses later, to understand what was required for each course, and possibly to work on the courses at that time.  WGU denied the request to open more courses and told him that when he completed a course, he could add another one.  It did not provide him the syllabus or reading list for any course in which he was not enrolled.

On July 6, 2023, WGU's Student Accessibility Services—apparently the same office as the Student Disability Services referenced in the Accommodation Policy—followed up on Rogers's earlier requests to his mentor for accommodations.  It sent him a link to WGU's Accommodations Policy and informed Rogers that to begin the process of obtaining a disability accommodation, he would have to complete forms describing the nature of his disability and the accommodation he wanted and told him where to find the forms.  The Student Accessibility Services office followed up on Rogers on July 11 noting that his courseload was already higher than other students'.  Rogers did not feel like he needed to respond to the Student Accessibility Services communications because his mentor had opened some additional classes for him. Having gotten no response from Rogers, on July 12, Student Accessibility Services closed

Rogers's disability inquiry file and told him how to continue if he wanted to further pursue a disability accommodation.  Rogers never began the accommodation request process described in the Accommodations Policy for his heart attack, tinnitus, or any other physical or mental health impairment.

In August 2023, Rogers asked WGU to extend the semester for him by one month.  WGU approved the request for one course.  Rogers completed two or three others by the regular end of the semester and one by the extended deadline, but was unable to complete one other in time. While Rogers's progress through his courses slowed after his heart attack compared to the rate of progress before his heart attack, by the end of the semester, he had completed fourteen undergraduate courses and received several professional certificates.  Rogers was upset because he wanted access to graduate level courses as well as undergraduate courses.  He asked WGU to allow him to begin work on his master's degree or to compress the master's program to one term. Toward the end of the semester, his program mentor gave him a detailed list of the things he needed to do to complete the dual-degree Accelerated Information Technology Program.

In September, WGU placed Rogers in two courses in two consecutive semesters.  Rogers could have continued his studies at WGU to finish his bachelor's degree by the spring of 2024 and to finish his master's degree by the fall of 2024, within eighteen months of his first enrollment.  The VA would have paid his educational expenses, although he would not have gotten a living stipend for the semester beginning in the fall of 2023 because he was not taking enough credit hours.  However, at the time, Rogers declined to continue with WGU partly because of his bad feelings about his time there and his experience with its programs.  He is still ambivalent about whether he would ever return.

5.    <u>Race Discrimination</u>

Rogers did not believe he was treated differently because of his White race.  He had no complaints about his mentors, instructors, fellow students, and he made no complaints to WGU about race discrimination.  Nevertheless, he had a sense that he might be suffering some race discrimination because WGU had "diversity, equity, and inclusion" ("DEI") activities.  He believes those activities created for him a hostile educational environment—a "subculture" of treating students differently—based on race.

6.    <u>Continuing Health Deterioration</u>

As a result of Rogers's conflicts with WGU, his physical and mental health deteriorated.  In December 2023, he became depressed and had passive suicidal ideation.  He had chest pain, stress-induced symptoms, and other cardiac-related issues into January 2024.

Rogers filed this lawsuit in November 2023 and filed the Amended Complaint in December 2023 asserting multiple claims:  Count I alleges disability discrimination by limiting access to courses and failure to accommodate his tinnitus and heart attack needs in violation of the American With Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, and § 504 of the Rehabilitation Act of 1973 ("RA"), 29 U.S.C. § 794; Count II is a claim under 42 U.S.C. § 1983 for a civil rights violation; Count III is a claim for violation of Title VI of the Civil Right Act, 42 U.S.C. § 2000d[2]; and Count IV alleges Illinois state law claims for breach of contract and fraudulent misrepresentation.  The Court dismissed Count II, so the only remaining claims are

---

[2] Rogers actually cites Title IV in his Amended Complaint (Doc. 12 at 5).  Title IV requires desegregation of public schools and universities, which are not involved in this case.  *See* 42 U.S.C. §§ 2000c to 2000c-9.  Title VI, on the other hand, addresses discrimination in federally funded programs like those available through private universities like WGU.  *See* 42 U.S.C. §§ 2000d to 2000d-7.  The parties' summary judgment briefing addresses Title VI, so the Court assumes Rogers intended to cite Title VI in his Amended Complaint.

Counts I, III, and IV.  In its motion for summary judgment, WGU challenges Rogers' ability to prove each of those counts.

**III.    Analysis**

After addressing a threshold question regarding discovery matters, the Court addresses each of the remaining claims in turn.

A.    Rule 56(d) Motion

Rogers's response complains that WGU has not properly responded to his discovery requests.  Indeed, there is a motion to compel WGU to comply with some of Rogers's discovery requests (Doc. 52) and a corresponding motion by WGU to strike the motion to compel because the motion was untimely and because Rogers did not adequately meet and confer with WGU before filing the motion (Doc. 55).  On November 19, 2024, the Court held a hearing on the motions at which it appeared some progress was made between the parties, so the Court deferred ruling on the motions.

The Court construes Rogers's request as a motion under Federal Rule of Civil Procedure 56(d) (formerly found in Rule 56(f)) to deny WGU's motion for summary judgment.[3]  Rule 56(d) provides,

> If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may:
> (1) defer considering the motion or deny it;
> (2) allow time to obtain affidavits or declarations or to take discovery; or
> (3) issue any other appropriate order.

"Rule 56 permits a district court to delay consideration of a summary judgment motion and order additional discovery before ruling if the non-movant demonstrates that it cannot present facts

---

[3] No substantive changes were made when Rule 56(f) was changed to Rule 56(d) in 2010. Therefore, caselaw decided before the change remain applicable to the current rule.  *Smith v. OSF HealthCare Sys.*, 933 F.3d 859, 865 (7th Cir. 2019).

essential to justify its opposition." *MAO-MSO Recovery II, LLC v. State Farm Mut. Auto. Ins. Co.*, 994 F.3d 869, 877 (7th Cir. 2021) (internal quotations omitted). The movant must file an affidavit or declaration that makes a "compelling argument why discovery should be continued." *Balderston v. Fairbanks Morse Engine Div. of Coltec Indus.*, 328 F.3d 309, 318 (7th Cir. 2003); *accord O'Grady v. Garrigan*, No. 20-3357, 2021 WL 4622256, at *2 (7th Cir. Oct. 7, 2021). The affidavit or declaration must point to specific reasons to extend discovery, "which requires more than a fond hope that more fishing might net some good evidence." *Smith v. OSF HealthCare Sys.*, 933 F.3d 859, 864 (7th Cir. 2019); *see Kalis v. Colgate–Palmolive Co.,* 231 F.3d 1049, 1057 n. 5 (7th Cir. 2000). The decision to grant or deny discovery pursuant to Rule 56(d) is committed to a court's discretion. *See MAO-MSO Recovery II*, 994 F.3d at 877.

Although Rogers has supported his response in opposition to summary judgment with numerous documents and pages of explanation, he has not submitted any affidavit in support of his request. Nor has he described what other discovery he needs that is necessary to his opposition to summary judgment. He has made no "compelling argument" about why the Court should deny summary judgment so that he can continue to pursue discovery. Indeed, his pending motion to compel production of documents appears to be based on Rogers's hunches—that WGU could possibly have altered, destroyed, or otherwise made unavailable "key evidence" (Doc. 52 ¶ 3), that it has produced so little that more must be out there (Doc. 52 ¶ 5), and that is recalcitrance suggests "the potential existence of undisclosed issues beyond the scope of the current litigation" (Doc. 52 ¶ 6). Rogers's Rule 56(d) request adds nothing more specific that he believes will enable him to properly oppose summary judgment. Furthermore, it appears that the discovery responses Rogers seeks are immaterial to the decision on this motion as set forth below. For these reasons, the Court will deny Rogers's request under Rule 56(d).

B.    Count I:  ADA/RA

Title III of the ADA prohibits the private operator of a public accommodation (like a private university) from discriminating against an individual "on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation. . . ."  42 U.S.C. § 12182(a).  It further construes the prohibited conduct to include a failure to make reasonable accommodations.  42 U.S.C. § 12182(b)(2)(A)(ii).  Similarly, the RA prohibits discrimination solely on the basis of disability in any program that receives federal funds, which includes most universities.  *See* 29 U.S.C. § 794(a).[4]

1.    Disability

WGU argues that Rogers cannot overcome the first hurdle to prove any claim under the ADA—that he has a disability.  Under the ADA, "disability" means "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment."  42 U.S.C. § 12102(1); *see* 28 C.F.R. § 36.105(a)(1).  The ADA further defines a major life activity to include hearing, sleeping, breathing, concentrating, thinking, and major bodily functions such as circulatory functions.  42 U.S.C. § 12102(2); 28 C.F.R. § 36.105(c)(i)-(ii).  The Court construes the definition of disability "in favor of broad coverage of individuals . . . to the maximum extent permitted by the terms in this chapter."  42 U.S.C. § 12102(4)(A); *see* 28 C.F.R. § 36.105(a)(2)(i); ADA Amendments Act of 2008, Pub. L. 110-325, § 2(b)(1), 122 Stat. 3553

---

[4] Generally, ADA and RA claims are functionally equivalent except for the extra RA requirement of federal funding, so the same legal standards apply.  *Wagoner v. Lemmon*, 778 F.3d 586, 592 (7th Cir. 2015) (citing *Jaros v. Ill. Dep't of Corr.,* 684 F.3d 667, 672 (7th Cir. 2012)).  Therefore, although the Court makes explicit reference only to the ADA in this section, its analysis applies equally to the RA claim pled in Count I.

(2008) (purposes of statute include "reinstating a broad scope of protection to be available under the ADA").

So the test for determining whether an individual is disabled is not meant to be difficult or the main thrust of ADA enforcement.  Under this standard, the Court finds that a reasonable factfinder could find Rogers was disabled by a number of impairments:

1. tinnitus because it substantially limited his hearing and concentration;

2. by his heart attack—broadly construed as cardiovascular disease—because it substantially limited his circulatory functions and breathing;

3. mental health conditions such as anxiety because it substantially limited his ability to concentrate and think; and

4. sleep apnea because it substantially limited his ability to sleep and breath.

Thus, although Rogers describes himself now as "pretty much okay," that description considers the ameliorative effects of mitigating measures he takes to care for himself.  But the Court does not consider such measures when determining whether a factfinder could find him disabled.  42 U.S.C. § 12102(4)(E).  He continues to have each of the foregoing impairments which, if not treated, substantially impair one or more of his major life activities.

Having found sufficient evidence that Rogers was disabled, the Court turns to the question of discrimination on the basis of his disability.

2.    Disparate Treatment Discrimination

To prevail his Title III ADA disparate treatment discrimination claim, after establishing that he is disabled under the ADA, a plaintiff must also prove that the defendant owns, leases or operate a place of public accommodation, and that the defendant discriminated against him by denying him the full and equal opportunity to enjoy its services because of his disability.  *See Morey v. McDonald's Corp.*, No. 18 C 1137, 2018 WL 11212379, at *3 (N.D. Ill. Nov. 26,

2018); *Lopez v. Catalina Channel Express, Inc.*, 974 F.3d 1030, 1033 (9th Cir. 2020); *J.D. by Doherty v. Colonial Williamsburg Found.*, 925 F.3d 663, 669 (4th Cir. 2019).

The Court has decided above that there is evidence from which a reasonable factfinder could find Rogers disabled under the ADA. WGU does not contest that it is a place of public accommodation within the meaning of the ADA and that it receives federal funding for purposes of the RA. *See Mershon v. St. Louis Univ.*, 442 F.3d 1069, 1077 (8th Cir. 2006) (citing *Amir v. St. Louis Univ.,* 184 F.3d 1017, 1025 (8th Cir. 1999); private university is a place of public accommodation). So the Court focuses on the last element—whether WGU discriminated against Rogers by denying him the full and equal opportunity to enjoy its services because of any of his disabilities.

To establish this element in this context under the ADA, Rogers must present evidence "that 'but-for' a disability, he would have been able to access the services or benefits desired." *A.H. by Holzmueller v. Ill. High Sch. Ass'n*, 881 F.3d 587, 593 (7th Cir. 2018). Under the RA, the standard is even more demanding; the plaintiff must show that his disability was the "*sole* reason for the alleged discriminatory action." *Conners v. Wilkie*, 984 F.3d 1255, 1260 (7th Cir. 2021) (ADA Title I claim for employment discrimination with similar accommodation requirements). It should go without saying that if a defendant does not know of a plaintiff's disability, the disability cannot be the reason for the defendant's decisions with regard to the plaintiff. *See James v. Hyatt Regency Chi.*, 707 F.3d 775, 783 (7th Cir. 2013) (in the employment context under Title I of the ADA, duty to accommodate triggered by plaintiff's informing defendant of his disability).

One of Rogers's assertions in Count 1 is that WGU discriminated against him on the basis of his disability when it limited his access to course materials. The Court construes this to

14

mean he is asserting that he would have been treated differently—given access to more than four courses at once—if he had not had a disability and everything else had remained the same. There is simply no evidence that this was true.  Four courses at a time was already well beyond what WGU allowed most students to take at one time, and no evidence suggests that had Rogers not had a disability, WGU would have bent the rules further to allow him to take more courses at the same time instead of sequentially.  Indeed, there is no evidence that WGU allowed *anyone*, disabled or not, access to the number of courses Rogers wanted.  In other words, as explained below, there is no evidence of "but-for" causation.

Rogers admits he probably did not inform WGU of his tinnitus, so there is no basis for asserting WGU decided to limit his classes because of it.  And even if WGU knew of Rogers's tinnitus from looking at his VA forms, no evidence suggests that the impairment played any role in WGU's decision not to bend its course limitation policy as far as Rogers wanted it to.  Nor does anything suggest WGU knew about Rogers's sleep apnea or based any of its decisions about course access to that disability.  As for his cardiovascular disease, WGU learned about that in May 2023 when Rogers had his heart attack.  However, WGU had given Rogers the same answer about additional courses both before and after his heart attack.  The consistency in WGU's response does not reasonably suggest Rogers's heart attack or cardiovascular disease motivated that decision.  Similarly, Rogers's mental health problems appeared to resurge after his heart attack, but WGU had given him the same denial of additional course both before and after that impairment resurfaced.  There is simply no evidence showing that WGU's course access decision was based on any of his disabilities and that "but-for" his disabilities, WGU would have allowed him to take more courses simultaneously.

Having found no evidence of disparate treatment discrimination on the basis of any of

Rogers's disabilities, the Court turns to the question of whether WGU discriminated against Rogers by failing to provide a reasonable accommodation for any of his disabilities.

### 3.    Discrimination by Failure to Accommodate

Rogers asserts in Count I that WGU failed to make "U.S. military service-connected and post-heart attack accommodations."  The Court construes this to mean he is asserting that WGU failed to accommodate his tinnitus, a service-related injury, and his heart attack or cardiovascular disease.[5]  In its summary judgment motion, WGU challenges only Rogers's ability to prove his requested accommodations were reasonable and necessary accommodations.  It does not attempt to prove the accommodations' impact on the nature of its academic program.

Title III of the ADA requires the operator of a public accommodation to make reasonable accommodations so individuals with disabilities can participate in and are not excluded from benefits.  It defines discrimination to include:

> a failure to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages, or accommodations.

42 U.S.C. § 12182(b)(2)(A)(ii); *see PGA Tour, Inc. v. Martin*, 532 U.S. 661, 688 (2001).  "The plaintiff bears the initial burden of establishing that the desired accommodation is reasonable and necessary, while the defendant bears the burden of showing that it would fundamentally alter the nature of the program."  *Matheis v. CSL Plasma, Inc.*, 936 F.3d 171, 178 (3d Cir. 2019); *see J.D. by Doherty v. Colonial Williamsburg Found.*, 925 F.3d 663, 671 (4th Cir. 2019).  The plaintiff

---

[5] Nothing in Rogers's Amended Complaint suggests he complains of the failure to accommodate his mental health condition or sleep apnea.  No evidence suggests he informed WGU of those disabilities or that he sought an accommodation for them.

must also explain how his requested accommodations were necessary to enable him to participate in the public accommodation. *Rossley v. Drake Univ.*, 979 F.3d 1184, 1197 (8th Cir. 2020). If he cannot make his showing, it is irrelevant whether his requested accommodation would fundamentally alter the nature of the program.

When a defendant receives a request for an accommodation, it must conduct "an individualized inquiry . . . to determine whether a specific modification for a particular person's disability would be reasonable under the circumstances as well as necessary for that person, and yet at the same time not work a fundamental alteration." *PGA Tour*, 532 U.S. at 688; *see Wright v. N.Y. State Dep't of Corr.*, 831 F.3d 64, 77 (2d Cir. 2016) (ADA requires entity "to engage in an individualized inquiry before denying a disabled individual's proposed accommodation," and Title III requires public accommodations "to make decisions based on facts applicable to individuals"). A defendant who fails to make an individualized inquiry into an accommodation violates the ADA. *Wright*, 831 F.3d at 78.

Often this individualized inquiry involves an interactive process with the individual with a disability. *See Igasaki v. Ill. Dep't of Fin. & Pro. Regul.*, 988 F.3d 948, 961 (7th Cir. 2021) (ADA Title I employment context). Both parties are required to participate in good faith and try to help the other party understand and determine specific appropriate accommodations. "A party that obstructs or delays the interactive process is not acting in good faith." *Beck v. Univ. of Wisc. Bd. of Regents*, 75 F.3d 1130, 1135 (7th Cir. 1996).

However, there is no independent cause of action under the ADA for breakdown of the interactive process; liability only arises when the failure to participate in the interactive process results in a failure to identify and offer an appropriate accommodation. *Igasaki*, 988 F.3d at 961. If a defendant who failed to engage in an interactive process provides a reasonable

accommodation anyway, there is no ADA violation even if the accommodation is not what the disabled individual prefers. *Id.* at 962. The ends, not the means, count. *Id.* at 961. The Court sees no reason not to apply this view as well to Title III failure to accommodate claims. *See Cesca v. W. Ill, Univ. Bd. of Tr.*, No. 4:23-CV-04043-SLD-JEH, 2024 WL 152812, at *10 (C.D. Ill. Jan. 15, 2024) (applying to Title II of the ADA for public services discrimination by public universities).

WGU argues that it cannot be liable for failing to make a reasonable accommodation because Rogers never formally requested one and declined the invitation to participate in the formal process. Consequently, although WGU knew of his heart attack and cardiovascular disease, it did not know his limitations from that disability or how allowing him access to more classes—whether by enrolling in them or being able to look at their syllabi or reading lists— would accommodate those limitations.[6] WGU argues it made accommodations—an extension of the semester deadline for a class and a detailed explanation of what Rogers needed to do to complete his degrees.

It is true that Rogers never made a formal, institutional request to WGU through the Student Disability Services. As a consequence, the formal interactive process for WGU to identify a reasonable accommodation never occurred. But this was Rogers's fault for not taking advantage of the process when WGU invited him to do so and for not acting in good faith to assist WGU to arrive at appropriate accommodations. Essentially, WGU became aware of Rogers's heart attack, invited him to engage in the interactive process under the Accommodations Policy, followed up when it heard nothing back from him, and then ceased its

---

[6] Apparently, WGU heard through the grapevine that he wanted to access more than four classes at a time because its July 11, 2023, response addressed his courseload.

apparently fruitless efforts, leaving the ball in Rogers's court to reinitiate the process.  It remained open to discussing Rogers's limitations and appropriate accommodation in good faith, but Rogers chose instead simply to demand his mentor to stray from the Accelerated Courses Policy.  In sum, he failed to participate in good faith with the process WGU had set up to handle the need for accommodations.

As a further consequence of his lack of good faith participation in the process, Rogers did not explain, and WGU was not able to identify, the nature of the limitations posed by his heart condition.  WGU was therefore not able to use that information when it identified what it believed to be reasonable and necessary accommodations.  All it knew was that he had had a heart attack, he had told his mentor he wanted to reduce his stress—an intuitively reasonable goal after a heart attack—and he wanted access to *more* classes than he was enrolled in at the time—a counterintuitive step toward reducing stress.  Rogers never explained to WGU why his requested accommodation of access to more classes, both undergraduate- and graduate-level, was reasonable in light of his limitations or necessary to his ability to participate as a WGU student.

Nevertheless, WGU accommodated Rogers by extending a course deadline when he asked and by giving him a "to-do list" to assist him in finishing his two degrees quickly.  It did not, however, allow him access to all or some components of additional classes, as he requested.  There is some indication his mentor attempted to help him but was not able to because what he requested violated WGU's Accelerated Courses Policy.  Importantly, Rogers did not provide reasons for WGU to conclude that allowing him access to more classes was a reasonable or necessary accommodation of his heart condition.  And, indeed, he was able to participate in

WGU's academic programs to complete numerous courses after his heart attack.[7]

For these reasons, no reasonable fact-finder could find the accommodations WGU made after Rogers's heart attack were not reasonable in light of the limited information he provided or that the accommodations Rogers requested were necessary for his full participation in WGU's academic programs. "That a plaintiff wants more or different accommodations does not make what he did receive unreasonable." *Igasaki*, 988 F.3d at 962. WGU is entitled to summary judgment on this claim regarding accommodations for his cardiovascular disease.

To the extent Rogers's claim rests on his disability of tinnitus, WGU is entitled to summary judgment on that claim as well. While WGU may have been aware of Rogers's tinnitus because it appeared on documents from the VA, Rogers never even suggested that he required an accommodation for that disability in order to participate in WGU's programs. Rogers has not pointed to any evidence that there was an accommodation, considering his individual circumstances, that WGU was required to make for his tinnitus that was reasonable and necessary to his participation as a WGU student.

The Court will grant WGU summary judgment on Count I in its entirety.

C.     Count III:  Title VI

Section 601 of Title VI of the Civil Right Act of 1964, 42 U.S.C. § 2000d, prohibits federally funded programs from intentionally discriminating on the basis of race, color, or national origin. *Alexander v. Sandoval*, 532 U.S. 275, 280-81 (2001). To avoid summary

---

[7] The Court must correct one misunderstanding of WGU. It suggests it would not provide near-unrestricted access to *any* student because it would violate the Accelerated Courses Policy. Reply at 3. This suggestion fails to recognize that in another case, a student may request such an accommodation and if, after considering the student on an individual basis, the accommodation appears reasonable and necessary and does not fundamentally alter WGU's program, WGU's policy must yield. However, this is not that case.

judgment, Rogers must present evidence sufficient to permit a reasonable fact-finder to conclude that WGU discriminated against him based on his race.  Of course, he bears the burden of proving his claim at trial, so he must submit evidence on summary judgment from which a reasonable factfinder could find in his favor.  *See Johnson v. Advoc. Health & Hosps. Corp.*, 892 F.3d 887, 896 (7th Cir. 2018) (Title VII context); (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986)).

### 1.   Standing

WGU argues that Rogers lacks standing to bring this claim because he cannot show he suffered, or is in danger of suffering a concrete injury because of his race, color, or national origin.  It notes that Rogers admitted he suffered no discrimination because he is White and that he merely has a hunch that the system is skewed against him because of WGU's DEI activities. On the merits, WGU similarly argues that Rogers cannot show that he was excluded from or denied the benefit of any of WGU's programs or that his educational environment is hostile.

The Court declines to address the merits of Rogers's claims in the guise of standing.  If he had evidence to support his allegations of systemic bias or unequal access to educational resources, he would have standing, so the Court declines to dismiss Count III on standing grounds.

### 2.   Disparate Treatment Discrimination

Turning to the merits of Rogers's disparate treatment claims, WGU's relies on the burden-shifting mechanism of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973), to prove discrimination under this traditional "indirect" method of proof.  WGU argues that Rogers cannot establish a *prima facie* case of discrimination.  It argues that he would be required to show: "(1) the plaintiff is a member of a protected class, (2) the plaintiff was meeting the

school's legitimate educational expectations, (3) the school took an adverse education action against the plaintiff, and (4) the plaintiff received worse treatment than that of a similarly situated student not in the protected class." *Richardson v. Lutheran Univ. Ass'n*, No. 2:14-CV-92-PRC, 2015 WL 6473638, at *5 (N.D. Ind. Oct. 26, 2015).

However, in 2016, the Court of Appeals for the Seventh Circuit encouraged courts to dispense with the direct/indirect proof dichotomy—and thus rigid adherence to the *McDonnell Douglas* burden-shifting mechanism—and concentrate on "the sole question that matters" and the evidence relevant to that inquiry. *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 764 (7th Cir. 2016). In a discrimination case, that question "is simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, [color, or national origin] caused" some adverse action. *Id.* at 765 (modified for this case). *Ortiz* was clear, however, that the burden shifting summary judgment analysis announced in *McDonnell Douglas* remains available as a formal way of analyzing a case with certain types of circumstantial evidence. *Ortiz*, 834 F.3d at 766; *see Lewis v. Wilkie*, 909 F.3d 858, 867 (7th Cir. 2018). But a plaintiff's inability to point to other similarly situated individuals treated better than he was under the *McDonnell Douglas* framework is not the death knell for his claim; he may still rely on other direct or circumstantial evidence of discrimination.

Citing *Gratz v. Bollinger*, 539 U.S. 244 (2003), Rogers argues that the system is skewed against him because of race. He notes that systemic institutional race-conscious policies can indirectly injure by providing disproportionate disadvantages to White individuals, and he suggests that WGU's DEI activities create a circumstantial case of racial bias. However, unlike the plaintiff in *Gratz* who was denied admission to a college that expressly used race-conscious admission criteria, *Gratz*, 539 U.S. at 251, Rogers does not point to any benefit withheld from

him but given to other students.  He notes only that he, like every other student, was not allowed to enroll in six to eight courses at one time.  This is not a *Gratz*-like case.

Rogers has not pointed to any evidence from which a reasonable fact-finder could conclude WGU intentionally discriminated against him because of his race, color, or national origin in denying a benefit.  As WGU notes, there is no evidence to support the *McDonnell Douglas* method of proving discrimination because Rogers has pointed to no similarly situated individual treated better than he was—that is, who was allowed to take six to eight courses at a time.  Nor is there other evidence even remotely suggesting WGU or any of its agents factored race, to Rogers's detriment, into any of its decisions regarding his participation in his degree program, specifically, whether to let students take six to eight courses at a time.  Based on the evidence, no reasonable factfinder could conclude that WGU intentionally considered race, either individually or in a systemic manner, in any decision involving Rogers in violation of Title VI.  His suspicion that race played a role in his treatment is too speculative to withstand summary judgment.

This is the sole area where the discovery Rogers did not receive could conceivably have shown some discriminatory intention.  However, in light of the *absolute absence of any suggestion* by other evidence that race discrimination against Rogers existed and that it deprived him of an educational opportunity, the Court believes his discovery was a mere fishing expedition in which he hoped against all hope to reel in the big one.  He admitted as much by testifying in his deposition that he "didn't have a problem with WGU . . . until things were falling apart."  Def.'s Mot. Summ. J. Ex. 1, Rogers's Dep. 27:6-8 (Doc. 54-1).  He further stated that he "threw in" this cause of action based on unknown effects of WGU's DEI activities, which led him to imagine that someone might be discriminating against him in some way because of his

race or national origin.

Furthermore, Rogers urges the Court to draw inferences in his favor because WGU failed to produce discovery documents to his liking.  He cites spoliation of evidence law in support of his position.  "Spoliation refers to the destruction or material alteration of evidence or to the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation."  *Silvestri v. Gen. Motors Corp.*, 271 F.3d 583, 590 (4th Cir. 2001); *see Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 216 (S.D.N.Y. 2003).  The Court has the inherent power to draw negative inferences against the spoliating party when necessary to redress conduct that abuses the judicial process.  *Silvestri*, 271 F.3d at 590 (citing *Chambers v. NASCO, Inc.,* 501 U.S. 32, 45-46 (1991)).  There is no evidence WGU improperly destroyed, altered, or failed to preserve any evidence or in any way abused the judicial process.  A negative inference is not warranted.

Likewise, WGU's mere failure to produce certain discovery documents does not warrant a negative inference of what the material contained.  Rogers's discovery requests ask for documents about anti-discrimination policies and training materials as well as all communications about discrimination complaints with an aim toward exploring the "institutional ethos" regarding these topics.  In their original form and as modified by Rogers, the requests are arguably overly broad, often ambiguous or irrelevant, likely seek some privileged information, and are arguably not proportionate to the needs of the case.  In other words, they were likely improper requests because they were not appropriately focused on this litigation.  Just as an example, Request 15 asked for "[a]ll internal communications, policies, documents, or other media discussing or related to the culture at WGU regarding discrimination, reverse discrimination, or any related topic" from January 2021 to the present date.  *See* Pl.'s Mot.

Compel Ex. at 40-42, 82-84, 127 (Doc. 52-3).  This request suffers from many of the defects noted above.  The failure to immediately and completely produce responsive documents and instead to try to work any disputes out with Rogers does not warrant any adverse inference from the subject documents.

        3.    <u>Hostile Educational Environment</u>

Nor can Rogers prove a racially hostile educational environment claim because of the existence of WGU's DEI activities or any other conduct.  To establish a hostile educational environment claim, a plaintiff must show the alleged harassment was severe or pervasive enough to deprive him of equal access to educational benefits.  *Qualls v. Cunningham*, 183 F. App'x 564, 567 (7th Cir. 2006) (citing *Bryant v. Indep. Sch. Dist. No. I-38 of Garvin Cnty, Okl.,* 334 F.3d 928, 934 (10th Cir. 2003); *Monteiro v. Tempe Union High Sch. Dist.,* 158 F.3d 1022, 1033 (9th Cir. 1998)).

First, Rogers is clear that those with whom he had contact—his mentors, teachers, and possibly other students—did nothing to him based on his race or offensive to his race that could have contributed to a harassing environment.  Instead, Rogers points to WGU's DEI materials addressing racism and making suggestions about how White people can work to eliminate it. He cites this as evidence of subtle patterns of bias and obstruction by a "subculture" of preference for non-White races.  Based on his unsupported belief that White people are excluded from DEO activities along with what he describes as his own "mistreatment" after February 2023, he believes he has indirectly experienced pervasive harassment that created a hostile educational environment.

Again, Rogers asks the Court to draw adverse inferences from WGU's failure to produce DEI information in response to his discovery requests.  Because his requests regarding DEI focus

on policies, procedures, and internal communications, they are not likely to be relevant to show the alleged harassing environment he experienced.  In these circumstances, the Court will not construe WGU's responses, or lack thereof, as containing information favorable to Rogers.

What is missing from Rogers's case is evidence that he was so harassed by any person, by DEI activities or materials, or by anti-White messages that he could not access educational benefits like any other student.  The environment he describes does not include any severe mistreatment or pervasive minor mistreatments that effectively changed Rogers's educational environment.  No reasonable factfinder could find that the offense he felt at the mere existence of WGU's DEI activities was so severe or pervasive as to deprive him of equal access to educational benefits.

For these reasons, WGU is entitled to summary judgment on Count III in its entirety.

D.    Count IV:  State Law Claims

In his Amended Complaint, Rogers relies on the Court's federal question jurisdiction to hear this case.  *See* Pl.'s Am. Compl. 1 (Doc. 12); 28 U.S.C. § 1331.  Since then, the Court has disposed of all claims asserting a federal question as a basis for relief (Counts 1, II, and III), leaving only Count IV, which asserts state law claims for breach of contract and fraudulent misrepresentation.

The Court has supplemental jurisdiction over Count IV under 28 U.S.C. § 1367(a), which extends supplemental federal jurisdiction to all claims that are sufficiently related to the claims on which original jurisdiction is based so as to be part of the same case or controversy.  However, § 1367(c)(3) provides that a district court "may decline to exercise supplemental jurisdiction . . . if . . . the district court has dismissed all claims over which it has original jurisdiction."  A district court has broad discretion in deciding whether to decline jurisdiction

over state law claims when no original jurisdiction claim remains pending.  *RWJ Mgmt. Co. v. BP Prods. N. Am., Inc.*, 672 F.3d 476, 478 (7th Cir. 2012).  The district court should consider judicial economy, convenience, fairness and comity.  *Wright v. Associated Ins. Cos.*, 29 F.3d 1244, 1251 (7th Cir. 1994) (citing *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988)).  When the district court dismisses all federal claims before trial, it is presumed that the Court should dismiss the remaining state court claims unless there are countervailing consideration.  *Payne for Hicks v. Churchich*, 161 F.3d 1030, 1043 (7th Cir. 1998) (citing *Wright*, 29 F.3d at 1251).  This is true even when the decision is on the eve of trial so long as the district court has not made a "substantial investment" of time in the litigating untried claims.  *RWJ Mgmt.*, 672 F.3d at 478.

The Court has considered the relevant factors and finds that it is appropriate to exercise supplemental jurisdiction over the remaining claims in this case because of the substantial work the Court has done on those claims and their patent lack of merit under Illinois law, which both parties assume applies to this case.  Thus, it would serve judicial efficiency to resolve these claims forthwith.

### 1.    Breach of Contract

In order to establish a claim for breach of contract under Illinois law, a plaintiff must prove "(1) the existence of a valid and enforceable contract; (2) substantial performance by the plaintiff; (3) a breach by the defendant; and (4) resultant damages."  *TAS Distrib. Co. v. Cummins Engine Co.,* 491 F.3d 625, 631 (7th Cir. 2007); *accord nClosures Inc. v. Block & Co.*, 770 F.3d 598, 601 (7th Cir. 2014).

Where the plaintiff asserts that a defendant university breached the contract for educational services, "the terms of the contract are generally set forth in the school's catalogs

and bulletins." *Raethz v. Aurora Univ.*, 805 N.E.2d 696, 699 (Ill. App. Ct. 2004); *accord DiPerna v. Chi. Sch. of Pro. Psychology*, 893 F.3d 1001, 1006 07 (7th Cir. 2018). Promotional materials, marketing materials, and advertisements do not provide the contract terms. *Miller v. Lewis Univ.*, 533 F. Supp. 3d 678, 684 (N.D. Ill. 2021). Illinois courts also recognize that a student may have a breach of contract action against a university where an adverse academic decision "was made *arbitrarily, capriciously, or in bad faith,*" *Raethz*, 805 N.E.2d at 699 (emphasis in original) or "without any discernible rational basis," *Frederick v. Nw. Univ. Dental Sch.*, 617 N.E.2d 382, 387 (Ill. App. Ct. 1993) (internal quotations omitted). "The burden of establishing arbitrary and capricious conduct is a heavy one." *Frederick*, 617 N.E.2d at 387.

There is no evidence that WGU violated any provision of its catalogs or bulletins. Rogers asserts that advertising and promotional materials provide the student-university contract terms, but they do not. Nor has he pointed to any evidence from which a reasonable factfinder could find WGU made any decision about him in a manner that was arbitrary, capricious, or in bad faith. Indeed, the evidence shows that every action it took was rationally based on documents in its handbook describing the Accelerated Course Policy and the Accommodations Policy. Thus, Rogers cannot succeed on a breach of contract claim.

### 2.    Fraudulent Misrepresentation

WGU first argues that Rogers has not pled fraud with the particularity required by Federal Rule of Civil Procedure 9(b). Rule 9(b) requires a plaintiff alleging fraud to "state with particularity the circumstances constituting fraud." Generally, pleading "with particularity" requires a plaintiff to describe the "who, what, when, where, and how" of the fraud, although that formulation is not set in stone and may vary based on the facts of a particular case. *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Walgreen Co.*, 631 F.3d 436, 441-42 (7th

Cir. 2011).  However, this is not the time for raising pleading error but for examining evidence. The disposition of this motion will turn on whether Rogers can point to specific evidence to support his fraud claim.

He cannot.  In order to establish a fraudulent misrepresentation claim under Illinois law, a plaintiff must prove "(1) a false statement of material fact; (2) known or believed to be false by the person making it; (3) an intent to induce the plaintiff to act; (4) action by the plaintiff in justifiable reliance on the truth of the statement; and (5) damage to the plaintiff resulting from such reliance." *Doe v. Dilling*, 888 N.E.2d 24, 35-36 (Ill. 2008).  A claim for fraud cannot be based on "puffing."  "Puffing denotes the exaggerations reasonably expected of a seller as to the degree of quality of his or her product, the truth or falsity of which cannot be precisely determined." *Barbara's Sales, Inc. v. Intel Corp.*, 879 N.E.2d 910, 926 (Ill. 2007).  Puffing "signifies meaningless superlatives that no reasonable person would take seriously, and so it is not actionable as fraud." *Id.*  Puffing is an opinion, not a statement of fact.

Rogers asserts that WGU made fraudulent promotional statements that its programs were "flexible," that students could "go at their own pace" as fast as they can, and that WGU supported veterans.[8]  These statements are puffing, that is, unmeasurable opinions that are not statements of fact.  There is no objective, meaningful measure of whether WFU's programs are "flexible."  Does that mean a student is not subject to any rules whatsoever or that a student may take four classes at once when the Accelerated Courses Policy provides otherwise?  Similarly, "support" of veterans cannot be objectively measured.  These statements are clearly puffing. And while a statement that a student can "go at his own pace as fast as he can" may provide a

---

[8] Rogers did not plead the two latter statements in the Amended Complaint, so they should not be at issue in this case.  Nevertheless, because the parties have identified the statements and proceeded as if they were in issue, the Court addresses them.

hair's breadth more specificity, no reasonable person would understand that to mean that the student is exempt from program rules. And even if that statement were not puffing, it is not fraudulent. WGU allowed Rogers to almost immediately begin another class when he finished one. Conceivably, he could "go at his own pace as fast as he could" to complete classes sequentially. Nothing about that representation states a fact that Rogers can take as many classes as he wanted to simultaneously, and a student's reliance on such a statement is not reasonable.

To the extent Rogers alleges WGU made a material misrepresentation by omission for not disclosing its academic policies, no evidence shows its policies were not available for him to review before deciding to attend WGU. And while Rogers is profoundly disappointed what he views as WGU's failure to meet its ethical duty to disabled veterans, such a failure would not amount to a legal cause of action in the nature of those in this case.

For these reasons, WGU is entitled to summary judgment on Count IV.

## V.    Conclusion

For the reasons set forth above, the Court:

- **DENIES** Rogers's request in his response brief to deny WGU's summary judgment motion pursuant to Federal Rule of Civil Procedure 56(d);

- **GRANTS** WGU's motion for summary judgment in its entirety (Doc. 53); and

- **DIRECTS** the Clerk of Court to enter judgment accordingly.

**IT IS SO ORDERED.**
**DATED:  February 20, 2025**


                              s/ J. Phil Gilbert
                              **J. PHIL GILBERT**
                              **DISTRICT JUDGE**